Good morning. May it please the Court, my name is Jesse Wing of McDonald Hogan Bayless and I appear on behalf of the appellant Richard Clairmont. If society permits government officials to punish witnesses, it compels to testify in court, the integrity of the justice system is threatened. Every day, attorneys subpoena reluctant witnesses to come into our courtrooms to testify in court. Here, a government official retaliated against just such a witness, labeling him disloyal because he testified on behalf of a criminal defendant. The facts here, the core facts, are straightforward and essentially undisputed. When Ms. Wilson heard that Mr. Clairmont testified against her unit's legal position in court on an issue of public importance, she promptly threatened to withhold referrals from his private employer unless Mr. Clairmont was removed from his position. Within days, Mr. Clairmont's employer fired him. Now, I'd like to make three points for the Court today. First, by disclaiming the authority to take the actions she did, that they were not a discretionary part of her job, Ms. Wilson is not entitled to even ask this Court for qualified immunity. Having discretionary authority to take the acts complained of is a prerequisite to qualified immunity. Secondly, that the citizen's test, the basic on-the-street-corner citizen test under the First Amendment applies to Mr. Clairmont. The government was not acting as a sovereign in this situation, but instead was seeking to revoke a valuable benefit, referrals that the government gives to every certified agency that does what Mr. Clairmont's employment does. There was a special kind of a special relationship here between the municipal court and Sound Mental Health. There was a relationship for a consulting agreement that allowed Sound Mental Health to use space in the public building. And in return, they got referrals, right? That is incorrect under all the evidence in the case. The referrals, according to the test... Why did they get space at the courthouse? They promised to hold groups there, groups of individuals, members of society, who need to be in a domestic violence perpetrated treatment program. But there's no problem. That was the only obligation under the, that was it? Just they got space? That is the essential obligation, and they were required to let the city know, here's how many people are coming through our program as a result of this, send us a monthly report that tells us that. That's the essence of that agreement. And we cite to the specific scope of agreement, it's Exhibit A to the consulting agreement, and that's what it says. You get the space. Now, that does not a contractor relationship make for the purpose of this case. All public referrals went to other types of agencies, like Sound Mental Health, without regard to whether they had a contract with the city of Seattle. Who made the referrals, the judges or the probation department? The probation department, according to the record, had a list of all these agencies. It may be three pages long of all these agencies, and the probation officers handed out the list, and depending upon who they were, they apparently sometimes made comments about who you could go to or who you should go to. Now, third, I would suggest to you that even if the court declines our suggestion that the unbear balancing test should not be applied, that even under the unbear balancing test, and I say unbear because this is not a pickering facts situation of public employment. It is supposedly a contractor arrangement, and there's a spectrum, and at best, we would fall in the middle of the spectrum. Now, even if you find that to be true, Ms. Wilson cannot establish entitlement to qualified immunity. There was no real disruption that was even alleged, mere hubbub at an individual meeting that was regularly scheduled that nobody but Ms. Wilson remembers. Even her top lieutenant testifies, I don't recall this. There obviously was no injury as a result of this speech, and she cannot in any way show that the government interest outweighs the overwhelming First Amendment right to appear in court and testify truthfully. And I would like to point out that while there can be debates about what the best form of domestic violence perpetrator treatment best accomplishes its goals, Ms. Wilson may feel very strongly about public safety. Mr. Claremont, likewise, it's in his testimony. Victim safety is what his work is all about, and he testified that he believes to the extent that he can continue to work with somebody and change their behavior and their opinions, that is the better approach. Now, we're not here to argue about which is the better approach. We're here to say that this is like deciding if you're more of a patriot because you believe we should be in the Iraq War or we should not be in the Iraq War. Ms. Wilson is not allowed to punish a citizen because he has a different view about what the best way is to engage in treatment. So let me ask you a few questions about the qualified immunity. Let's just assume if we were to take all the facts as required on summary judgment at this stage, in the light most favorable to your client because they're the non-moving party and, you know, summary judgment was in favor of the defendants. Let's just assume that you take all those allegations and that whether you either are a balancing test or just a pure private citizen test, that the facts would establish a constitutional violation. Yes. Okay, so the next step in the qualified immunity analysis is whether the law was clearly established at the time of the incident To the extent that a reasonably informed public official would be aware that if they engaged in such conduct, you know, they might be engaging in conduct that violates the Constitution. Now, what was available at the time of this incident that was in 2007, somewhere around there? Yes. That would, you can point to, that would apprise a reasonably informed public official that if they engage in this kind of conduct, they might have some problems. Well, Your Honor, I would start with Alpha Savers v. Hansen. If this Court decided in 2004, which said that testimony in court is protected under the First Amendment, a matter of public concern, that's assuming that the Umber test applies. That was a contractor case. And the Court very clearly said there, in denying summary judgment and qualified immunity, that any reasonable official would know that to be the case. I would also draw the Court's attention to Rivera v. City and County of San Francisco two years earlier. The Ninth Circuit held essentially the same, although that was a public employee case. Worrell v. Henry is also a case that I think supports the idea that a public official would know that punishing an individual in that case involved law enforcement would violate the Constitution. And almost directly on point is Helvey v. City of Maplewood out of the Eighth Circuit, in which the Court said you simply can't terminate or a public official cannot call up a private employer and get them fired for testifying in court. Are you familiar with Robinson v. York? Yes, of last year. Because the events in that case took place in 2005, and we held that a similar right was clearly established at that time. I think that's right. That involved a testimony or the potential testimony. The person, I think, did not even testify in a class action, and the Court said without doubt that's clearly established, qualified immunity denied. And as you say, the facts were in 2005. Is the qualified immunity issue more nuanced, though, than simply whether this person is protected by testifying? Doesn't it have to go to the nature of the testimony? The briefs cite a circuit split on whether testimony is or is not a matter of public concern. A number of circuits have said a certain testimony is not a matter of public concern. And I wonder, given that the guidance we have is that these are fact-specific, if somebody would have been on notice that testifying about plaintiff's experience with these groups was clearly a matter of public concern, if that would have been clear. Thank you for the question, Your Honor. I believe it is very clear. Public concern as defined by this court in Hudson v. Craven back in 2005, quoting the U.S. Supreme Court, says, public concern is something that is the subject of legitimate news interest. You could go into any newspaper over a period of years and find articles about domestic violence. You could go to the legislature and see it be debated. What is the proper way to deal with this problem in society? Should people be sent to groups? Should they be sent to prison? Should they be strictly enforced, the deadlines? Or should there be deadlines in place? Mr. Claremont's views were on a matter of public concern, and I might add in a criminal proceeding in which the state is taking an effort to try to deprive somebody of their liberty. And further, there were allegations of race discrimination at this hearing, that her client was being treated differently because of his race. Let me ask you this. Is it your position that compelled testimony, that is somebody who is testifying as a result of having been subpoenaed to court, is per se a matter of public concern? I'm sorry. I think the Ninth Circuit has made clear in Alpha Savers that it has not made that decision yet. I believe strongly that it is important that witnesses know that if they testify, they will be protected from retaliation and the court should adopt a per se. Why is that the case? Suppose there's a, I don't know, a child custody matter involving somebody's neighbor, and they go in and say, well, so-and-so is not a fit parent, and I know it because we do drugs every night. Is that a matter of public concern? And that person's testimony can't lead to an investigation of whether they're violating their employer's rules and so on and so forth. Why is a per se rule a good idea? Well, first I would say, at the very least in a criminal matter, it should be per se. I think that in general it's important because in that situation, there may be an investigation into the person's conduct. Okay? It's not their testimony. It's the fact that they've admitted to using drugs and that places a child at risk. That's an admission of a crime in court as opposed to showing up and testifying. So I would view this as an important per se rule because it protects witnesses to know that if they come to court, they won't be punished for testifying. We wouldn't have to adopt a per se rule for you to prevail in this case. Absolutely. I agree. Okay. With your permission, I would like to reserve the rest of my time for rebuttal. You may do so. Thank you very much. Good morning. May it please the Court, I am Erin Overby on behalf of Joni Wilson, the respondent, along with my co-counsel, Mr. Wallet. Ms. Wilson takes the position that she acted here as any reasonable probation manager would under these circumstances. She was confronted with ongoing complaints about the competency of Mr. Claremont. And her concern, along with that of her probation staff, is he was not acting in the best interest of domestic violence victims. They saw their role as one of partnership. You mean when he testified? Is that what you're saying? They didn't see him working in the best interest of their programs. When he testified, the nature of what he testified to, is that what you're saying? The nature of what he testified to caused them to believe that he did not value victim safety the same way they did in their program. And they did believe they worked in partnership with him. There are some letters to Mr. Claremont in the record that talk about their mutual clients. So what you're saying then is that the fact that he testified, and that his testimony was, he was subpoenaed to testify, was a factor in their decision-making process. The fact that he testified inconsistently with their view of victim safety was what caused her to contact the employer once again. But it's the fact of his testimony. In other words, if he hadn't testified, we may not be here today. Well, I don't know that that's true. I mean, I don't know if it's true. If he had said the same thing in the hallway outside, would she have done anything different? I mean, I think that it really is the content of what he said. It's not the fact that he was in a courtroom. And going to the issue of the per se rule, I think that's true. That's actually an interesting question, because is there a distinction? Can there legitimately be a distinction between retaliation for the fact of testifying and retaliation for what is said? And should they be treated any differently? Well, I suppose it's a very fact-dependent analysis. I think it would be kind of difficult to come up with a situation where someone was retaliated against because they took the witness stand. It's usually the fact that they took a point of view on the witness stand, I suppose. Well, it wouldn't have to be. Somebody could be fired for missing work that day when they had to go test. That's a different set of issues. But in the First Amendment context, which this is, it's the content that we're looking at, I guess. It is the content. And that's the point. Let me just add this. As a trial judge, you want to feel confident that anybody who's going to testify, whether by subpoena or voluntarily, that they're going to testify honestly and truthfully and forthrightly and not out of fear that what they might say may later be used against them by their public employer. Isn't that right? Yes. Don't we all want to feel that way? I mean, you'd want to feel that way if you had witnesses up there on the stand. Yes, I would agree with that. So here, how does that notion play into what you just were explaining to me? That is, the content. I'd like to answer the question by saying that I think there are circumstances where things happen as a result of speech, and I think we have those in our Ninth Circuit jurisprudence or actually Supreme Court, where there is an adverse action that results when somebody engages in what sounds like pretty righteous speech. I mean, what about Mr. Sabalos when he was undercutting an arrest warrant and he was retaliated against? Well, he was writing a memo to his supervisor. That's correct. But it was a righteous memo. I mean, I think we would want our employees to say, oh, my gosh, there's no probable cause there. There's incorrect facts in that affidavit. That's not something we want going to trial. We wouldn't want a case going forward without probable cause. So his concern was a righteous one, but you're right. I mean, he said it in the context of an employee. I mean, the point I'm trying to make is sometimes there are consequences, and maybe this is one of those times where there are consequences that are negative that happened after testimony. But I think that the testimony in this case is not the only issue. I think you have to look at the content of the testimony in this case, and I do think it's very significant that Mr. Claremont spoke as a contract employee. I don't think there's much dispute in the record about whether or not he was a contract employee. Counsel suggested to you that there was a very limited relationship, and I would suggest that that is not a correct assessment of the record. So what was the nature of that contract? Well, the contract is the same. I'll tell you. The contract, which is in the excerpt set 346, said, The relationship of sound mental health to the city, quote, shall be that of an independent contractor. Which paragraph? I'm on the excerpt of record at 353. Okay. That's where it says the relationship, quote, shall be that of an independent contractor, the relationship between Mr. Claremont's agency and Seattle Municipal Court. The same agreement says that Claremont's agency will, quote, provide screening. I'm on excerpt of record 358. Referral, case management, and consultation to the probation unit. And it also says they will attend meetings with SMC staff. It says that Claremont's agency could not assign or transfer or reassign any person essential to the work under the contract. This is much more than giving someone space in the building. There was a close relationship. There was a contract, and I think that's something. Does the probation department have these types of contracts with all the providers of domestic violence services? No, they don't. No, they don't. This was a unique contract. This was a unique contract, and I think that's very clear in the record. If we look at Ms. Wilson's declaration, she talks about that unique relationship, that not everybody did have this. They didn't have the Samuel Health Agency had some of their staff physically present at the court. They had offices there, and they did hold group there. So there was a very close relationship, and, in fact, as I said earlier, the probation counselors considered themselves to be working in partnership. They saw it as a mutual project for both the probation unit and the counseling service, which was Mr. Claremont, to monitor these people, to make sure that they were compliant with the terms of the court orders. So they were working together. This is much more like a public-employer relationship than it is like an ordinary citizen. He was not speaking as an ordinary citizen, and, of course, we think that is very significant because, of course, a public citizen has much lower burden than Mr. Claremont does as a contract employee. What is the government's injury or disruption or interest that outweighs the right to testify truthfully? I think this agency that we're talking about had a very important job that they expected Mr. Claremont and people like him to be assisting them with. And if you look at the case that's cited in the materials as establishing a claim for negligent supervision, there's some very concerning kinds of behavior that happens bringing people into this program, and it really lays out the relationship between the counselor and the probation unit. I'm talking about the Hertog case. In that case, a counselor said this person could benefit from treatment, which he won't get if he's incarcerated. So he was ordered into treatment. Well, the treatment provider didn't see the client regularly. I think he saw him once in about three and a half months. He didn't do the mandatory testing. And by the time the probation counselor found out that these things hadn't occurred and he wasn't compliant, I mean, had he known earlier on, he could have done what's called a revocation hearing. He could have brought it before the court and said, this person's not showing up and we need to take some action. So by the time it happened in that case, the defendant had raped a 6-year-old child. So there are some significant interests that the probation unit has in making sure that people are acting in a way that is consistent with their view. Their view requires that we take victim safety as the primary concern, and that's what they were doing. That was Ms. Wilson's concern. That was the probation unit's concern. And I think that's a very strong interest. And I think compared to that, I mean, what we really are looking at is the content of Mr. Claremont's speech. I agree that there's a compelling interest in people testifying truthfully, but looking at the content of what he said that day, it's not like the Alpha Energy case at all. He's not talking about discrimination. He's talking about if this person came to me and these were the facts, this is how I would handle a specific case. It's not talking about discrimination. It's not talking about government mismanagement. It's not talking about anything in that realm. It's his personal view. And I think that that's a little less significant than the other cases. And the less it caused specific concern or lots of concern on the part of Ms. Wilson. It caused concern because of the history. There was a history here that hasn't been talked about, and that history goes back eight months before this testimony took place. But that could be an issue potentially for trial. In other words, the question here is only whether summary judgment was appropriate. If summary judgment was not appropriate, all kinds of evidence could be brought in potentially showing that this was a lousy employee for a whole lot of other reasons, but that's not our concern today. How is that relevant to what we have to look at today? Well, I'm saying the reason it caused concern wasn't because of the fact that it was said that day in testimony. The reason it caused concern is because it was reaffirming a pattern of information they had about Mr. Claremont. That was the concern. It wasn't just what he said that particular day about that particular case. It was an ongoing thing with Mr. Claremont. That was why it was a concern. And I also would say that I'm not sure that going back to the standard for summary judgment, it was clearly established that Ms. Wilson could not call up Mr. Claremont's supervisor and say we're concerned about some things that he said in his testimony. We're concerned about referring people to your agency. She contends she didn't say that. I understand for summary judgment we assume that she did. But we don't think it was clearly established. And I think even if you find that it was clearly established, you also have to find that no reasonable person in her position would think it was reasonable to contact her contract employer and say we have a problem with one of your people and here's the problem. And I think if you look at the content of the discussion between Mr. Wynn and Ms. Wilson, they were talking about ongoing problems, confirming the prior things that had been raised, and Ms. Wilson, contrary to what has been said, did not tell Mr. Wynn to fire him. What she said was there could be some, you may have fewer referrals. She said some people had already been referring to other agencies, she thought, before the testimony. She didn't tell him to fire Mr. Claremont. That was a decision by Sound Mental Health, Mr. Claremont's employer. And Ms. Wilson didn't make the decision. We contend she's not responsible for their decision to take him away from a job where he could have been transferred, he could have been closely supervised. Those were the options. I mean, she had no way of controlling that. But she did, I think, have a pretty important responsibility to the victims, to the people who can potentially be harmed when someone doesn't comply with the terms of a court-ordered deferral program. And that's what we're talking about. She thought it was a significant concern, and based on what had happened at the city years prior in the Hurtog case, that was a pretty legitimate concern. And, in fact, the whole staff was trained. I shouldn't even probably raise this with you, but it was the judge that made the ultimate decision, correct, in that particular case? In which case? In the case where he was testifying. About revocation? Yes. Yes. He decided not to revoke, right? That's correct. You think it was just based on what the plaintiff testified to? Do I think it was? I mean, that was the testimony here by Claremont. Was that what tipped the judge? No. In fact, he said it wasn't important to him at all. It was of no significance to the judge who made the revocation decision. So I don't know how important it was, but it wasn't important to the judge. All right. I'm almost out of time, so I just want to conclude by saying that it's our contention that Ms. Wilson acted reasonably and that she is entitled to qualified immunity. She knew that she was possibly responsible for negligent supervision if she allowed ongoing incompetence of a treatment provider through Seattle Mental Health. She knew that she and her staff disagreed with his treatment policy. Why didn't she just make a complaint to the state? That's not in the record, but I know the answer if you'd like to know. I'm only concerned about what's in the record. Okay. It's not in the record. It's not in the record. But you raised the point. It could have. Yes, and actually had she said the same thing to the state that she said to Sound Mental Health, there's no question there would be immunity for that same statement. She could have called up DSHS and said, I'm going to stop or recommend stop referral to Sound Mental Health because I think Richard Claremont doesn't take victim safety seriously and she'd be immune from any liability. It's because she said it to the employer as opposed to the investigator at DSHS that we're here. Okay. Thank you, counsel. Thank you. We have some rebuttal time remaining. Thank you, Your Honors. I don't have much time, so I'm going to try to zip through this if I may. First, Ms. Wilson could have talked to her boss, Mr. Bonner, who testified in this case that there was nothing wrong with Mr. Claremont's testimony and this whole concept that Mr. Claremont is putting victims at risk based on his testimony in court, there is no basis for it except Ms. Wilson's lay opinion. Judge Bonner says that, Mr. Claremont testified that, and the only expert in the case, another DV perpetrator, treatment provider, Dr. Gerlach testified the same. I do not believe that this court can credit her concerns, genuine as otherwise, as outweighing on behalf of the government Mr. Claremont's right to testify truthfully in court. Would that be, if the summary judgment were not upheld, would that be an issue for trial, though, the reasonableness of her belief? A jury could disagree with what you've said, I guess is what I'm getting at. Yes, I think that's correct, and we should be given the opportunity to ask the jury that. But you're not asking for summary judgment in return, you're asking for reverse and remand, correct? Well, I believe that if this court finds that the citizen testifies, that there is no defense here and that Ms. Wilson has actually admitted a liability. We did not file a motion for summary judgment. I think it's within the court's power if it determines in judicial efficiency that this does not need to go to trial except for damages. But that's within the court's power. We are asking for the opportunity to take this case to trial. I would draw the court's attention to ER 367 through 70, which is a list, a four-page list of all the DV programs that the city sends individuals to. And this has nothing to do with the contract. This is what's handed out to everyone. And I'd also point out, I'm not sure what contract was being read to you, but the only thing that this contract says is you get office space, we can audit your books, and you will come to some meetings with us periodically. That's all I saw in that contract. I'd also like to point the court's attention to Merritt v. Mackey, which is in our reply at 25, in which the court said, this court said, there are public officials in doing an evaluation of a private company said, this person who is a counselor supervisor for treatment services needs to be removed from their job. And this court said when those officials admitted that it was not within the scope of their authority to take that action, that there was no qualified immunity analysis allowed. Similarly, in Groton v. California, this court found that the ministerial acts of a public official prevented them from seeking qualified immunity. We don't think there's ministerial acts here, but the point is that it is a prerequisite to asking for qualified immunity. I see that I'm about a minute short. You are over time, so. Apologies. Unless there's anything further, I've asked you to consider questions. Thank you, counsel. Thank you very much for your time. The case just started to submit it. The arguments were very helpful. Ms. Overby, I would ask that in future your office note that the lawyers are expected to be here at 9 to check in for future reference. With that, we stand adjourned for this week's calendar. All rise.
judges: Burns, Graber, Paez